# Herd et al. *v.* Thompson, Appellant.

*Stock—Contract to purchase—Measure of damages.*

Where defendant agrees with plaintiffs that, if they will subscribe to certain stock and do not want it and cannot pay their subscription therefor, he will take it off their hands, he is responsible to them for whatever loss they sustain by reason of his subsequent failure to comply with his agreement; and the measure of damages is the difference between what they were obliged to pay for the stock and what they subsequently sold it for.

Argued May 11, 1892. Appeal, No. 445, Jan. T., 1892, by defendant, Samuel Thompson, from judgment of C. P. Fayette Co., March T., 1890, No. 400, on verdict for plaintiffs, E. Herd and E. Chamberlain, trading as E. Chamberlain & Co. Before PAXSON, C. J., GREEN, WILLIAMS, MITCHELL and HEYDRICK, JJ.

Assumpsit on an agreement to purchase stock.

The facts as developed at the trial appear by the following charge of the court below by EWING, J.

" This is an action brought by E. Chamberlain & Co. against Samuel Thompson, for the purpose of recovering damages from the defendant, which it is alleged they sustained by reason of his failure to fulfill and perform a contract which they say he entered into with them on the 28th day of February, 1887.

" So far as there is no contradiction in the testimony, the facts seem to develop about this state of affairs: That there was a natural gas company in Brownsville by the name of the Home Natural Gas Company, in which there were ten recognized stockholders, E. Chamberlain & Co. being one of the ten. That company had a capital stock of five thousand dollars. Along about the spring of 1887 they thought it advisable, by reason of developments made upon their territory and the necessity for raising funds to pipe the town, to increase their capital stock, and on the 28th of February, 1887, they held a meeting at the office of Mr. Lenhart in Brownsville, at which meeting the resolutions offered in evidence here were adopted, providing that the franchises, rights and property of the company as held at that time should be put into the company at a capitalization of fifty thousand dollars, including the five thousand already paid in, and that fifty thousand dollars of addi-

tional stock should be issued for cash, making the capital stock then, instead of five thousand dollars, one hundred thousand dollars. Of the fifty thousand dollars represented by the money already paid in and the property and rights of the company, it was provided that the original ten should take their pro rata share, each receiving one tenth, and be allowed to take the additional stock to an amount equal to the amount of paid-up stock held under this arrangement.

" Now some of the parties, it seems, made no objection to subscribing to the stock under that arrangement. They held five thousand dollars of the old stock and could take five thousand dollars of stock to be issued for cash.

" But the plaintiffs in this case testify that they demurred and didn't care about making that subscription, especially since all the parties who were interested in the subscription of E. Chamberlain & Co. were not present at the meeting, and the amount to be paid being considerable, and they expressed their disinclination to take any of the cash stock, as we may term it to distinguish it from the full-paid stock, and that then Mr. Thompson, the defendant in this case, came up to them and said to Mr. Chamberlain, ' You take that stock, and whatever of it you and your parties don't want to take I'll take.' That then he called Mr. Hurd up and Mr. Thompson repeated that in Mr. Hurd's presence ; and that upon the basis of that representation and agreement on his part that, if they would subscribe for that fifty thousand dollars to be issued for cash, in proportion to what they held of the full-paid stock, and they and their parties didn't want it, to the extent that they didn't want it he would take it off of their hands, they made the subscription.

" Now Mr. Chamberlain testifies that that was the agreement, and Mr. Hurd testifies that he was called up by Mr. Thompson and that he told Mr. Thompson that he didn't want to take it, and that Mr. Thompson told him that if he and his parties didn't want to take it that he would take it from them, and that then the subscription was made ; that he afterwards told Mr. Thompson that same night, ' I don't want my share of that subscription of E. Chamberlain & Co. and you can take it,' and that Mr. Thompson says, ' All right, I'll take it.' That then after a call for the first assessment on that stock was made, he saw Mr. Thompson on the street one day and handed him the

call and told him it was his, Thompson's, stock and he could
just take care of that—pay it, and that Mr. Thompson then re-
fused to take it; said he had enough and didn't want any more.
Mr. Chamberlain says that he saw Mr. Thompson within ten
days of the subscription and told Mr. Thompson that they were
able to take care of twenty-one and one half shares of the sub-
scription and that he could take the balance, and that Mr.
Thompson said he didn't want it; that then Mr. Hurd and Mr.
Chamberlain went to see Mr. Thompson at his house shortly
after that, and there again asked him to fulfill his agreement
he had made with them, and that he refused again to do it,
saying that they told him how much they had been able to dis-
pose of.   Mr. Hurd says further, that, at that interview at Mr.
Thompson's house, he repeated to him the agreement that he,
Thompson, had made with them the night of the company's
meeting at Mr. Lenhart's office, and that Mr. Thompson said,
' yes, yes, but I don't want any more ; I have enough of it,' or
something of that kind.

"Then Mr. Robert Graham says that at the meeting he saw
Mr. Hurd and Mr. Chamberlain talking to Mr. Thompson and
he came up and heard Mr. Thompson say : ' That's all right.
I want it; take it; that'll be all right.'   And Mr. Moore says
that he heard Thompson make a declaration, I understood him
first to say, in reply to a question of Mr. Chamberlain's, and
then afterwards I understood him to say that it was a general
declaration addressed to no one in particular, that if anybody
had more than they wanted that he would take it.

"Now, upon that testimony, the plaintiffs ask you to find
that whatever stock they subscribed for and they were unable
to take or didn't want to take, Mr. Thompson was to take off
of their hands.

"It seems that after they had been unable to get Mr.
Thompson to take this stock, that they couldn't carry it,
didn't want to carry it and didn't carry it.   They tried to dis-
pose of it and finally succeeded in selling the stock to Mr.
Samuel S. Graham of Brownsville, conveying it to him as full-
paid stock at sixty dollars a share ; agreeing to pay or indemnify
him for any calls on the stock over and above that amount.
And from the testimony in the case it seems that ninety-eight
dollars per share was called, being thirty-eight dollars per share

over and above what Mr. Graham agreed to pay them for it, and that for that amount Mr. Graham has a judgment against these plaintiffs, pursuant to the contract they made with him when they transferred the stock to him to be responsible to him for any calls upon the stock over and above sixty dollars per share.

" Now on the part of Mr. Thompson he doesn't deny that he was at that meeting and that there was some talk there about these subscriptions.   He says, according to my recollection of his testimony, that he made the assertion there as I think he put it when he was on the stand, that if they had any more stock there than they wanted to carry he would take it. He doesn't explain that and he doesn't say anything more than that according to my recollection of his testimony, and I am not certain whether he says that he said that to these parties, or made it as a general declaration in the meeting; you will remember.   But he goes on to state that he expected to get that stock—to take the stock off of the hands of the other subscribers there at just what it had cost them; and the argument of his counsel here is, that his declaration and agreement, if he made any there at that time, was that he would take all of their stock—their full-paid stock as well as their subscription to the cash stock at just what it had cost those parties, and he says that that being the agreement that he made, it wasn't what the parties here allege; that they never offered to transfer to him their full-paid stock at all, and they don't deny that they didn't offer to transfer their full-paid stock to him.

" Now you will have to determine what the agreement between these parties was, because upon that agreement must depend your verdict in this case.

[" If that subscription was made by the plaintiffs in this case upon the faith and basis of the agreement they allege Mr. Thompson made with them, and that agreement was, that if they didn't want and couldn't take their subscriptions to this cash stock that whatever amount they didn't want and couldn't take he would take off of their hands, then he would be responsible to them in this action for whatever loss they sustained by reason of his subsequent failure to comply with his agreement, and that would be the amount that they had to pay over and above the amount that they sold the stock to

Mr. Graham for, which was thirty-eight dollars a share, and upon that amount you could allow interest from the time that they paid it up to this time if you wish to do so, as part of the damages.] [2]

" If on the other hand you should find that the agreement was that they were to transfer both their paid-up stock and the other, and they never offered to carry out that agreement, why of course your verdict should be for the defendant.

" The plaintiff's counsel will furnish you with a calculation, and if you should find for the plaintiffs and find the calculation to be right, you can adopt it as your own; otherwise you can make one for yourselves."

The evidence for the plaintiffs was that the $60 per share for which they sold the stock to Graham was the best price they could obtain for it.

The verdict was for the plaintiffs in the sum of $1,376.67.

*Errors assigned* were (1) a ruling on evidence, abandoned; (2) the charge of the court as above in brackets, quoting it.

*Edward Campbell*, for appellant.

*R. P. Kennedy*, with him *R. H. Lindsey*, for appellees.

Per Curiam, May 23, 1892:

We do not think it was error to exclude the testimony referred to in the first specification. It is sufficient to say that it was irrelevant.

Nor do we see error in that portion of the charge of the learned judge below embraced in the second specification. If the defendant agreed, as the plaintiffs alleged, that, in case they would subscribe for the stock in question, and if they did not want it, and could not pay their subscription therefor, he would take it off their hands, he would certainly be responsible to them in this action for whatever loss they sustained by reason of his subsequent failure to comply with his agreement, and the measure of damages would be the difference between what they were obliged to pay for the stock and what they subsequently sold it for. This was substantially what the court told the jury, and they have found the contract as claimed by the plaintiffs, and have assessed the damages in strict compliance with the charge of the court.

Judgment affirmed.